IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ANGELICA MENDOZA,                    ) | |
|                                      ) | |
|           Plaintiff,                 ) | |
|                                      )   No.  CV-09-1300-HU | |
|      v.                              ) | |
|                                      ) | |
| WASCO COUNTY, a political            ) | |
| subdivision of the State of          ) | |
| Oregon; RICK EIESLAND, an            )   OPINION & ORDER | |
| individual; and STEVEN               ) | |
| CONOVER, an individual,              ) | |
|                                      ) | |
|           Defendants.                ) | |
| ———————————————————————————————      ) | |

Michael K. Kelley
Matthew E. Malmsheimer
HAGLUND KELLEY HORNGREN JONES & WILDER LLP
200 S.W. Market, Suite 1777
Portland, Oregon 97201

        Attorneys for Plaintiff

Kari Furnanz
HOFFMAN, HART & WAGNER LLP
1000 S.W. Broadway, Twentieth Floor
Portland, Oregon 97205

        Attorney for Defendants

HUBEL, Magistrate Judge:

        Plaintiff Angelica Mendoza brings this employment-related

1 - OPINION & ORDER

action against defendants Wasco County, Wasco County Sheriff Rick Eiesland, and Wasco County Chief Deputy Sheriff Steven Conover. Defendants move for partial summary judgment.

All parties have consented to entry of final judgment by a Magistrate Judge in accordance with Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c). I deny the motion.

BACKGROUND

Plaintiff began working for the District Attorney's (DA) Office in Wasco County in August 2004. The DA's Office works closely with the Sheriff's Department, and plaintiff's Office Specialist job duties included transporting mail between the offices and translating for sheriff's deputies when working with Spanish-speaking individuals. Pltf's Affid. at ¶ 2. Plaintiff's work at the DA's Office routinely brought her into contact with sheriff's deputies, including Conover. Id.

At times, Sheriff's Department employees and DA Office employees socialized together including going to lunch as a group or for drinks after work. Pltf's Depo. at p. 36. Plaintiff denied participating in any of those social activities when Conover was there. Id. However, plaintiff sometimes did go out after work with Sheriff's Department employees, including Eiesland, on occasion. Id.

Plaintiff had a joking relationship with her coworkers, including sheriff's deputies, that sometimes involved sexual or off color jokes. Id. at p. 40. No one else but Conover made her uncomfortable, however. Id. Plaintiff had a friendly relationship with Eiesland. Id. at p. 37. She admits that one of the jokes she participated in included her approaching Eiesland's vehicle and

2 - OPINION & ORDER

1  raising her shirt in front of Eiesland.

2      Generally, plaintiff was aware that sexual harassment was not
3  permitted at Wasco County.  Pltf's Depo. at p. 9.  She also
4  understood that employees needed to make a report if they were
5  subjected to harassment.  Id. at p. 10.

6      A.  Incidents Between Plaintiff and Conover

7      When plaintiff first started working for the DA's Office,
8  Conover asked plaintiff if she was married.  Pltf's Affid. at ¶ 3.
9  Plaintiff responded that she was, they continued chatting, and he
10 left.  Id.  He remained "very friendly" toward her every time she
11 encountered him.  Id.

12     Eventually, Conover began to call her "sweetie."  Id.  She
13 initially thought nothing of it, but finally told one of her
14 friends in the DA's Office about it.  Id.  This person told
15 plaintiff that Conover was a "predator."  Id.[1]; Pltf's Depo. at p.
16 43 (noting verbal statements of  "sweetie"), p. 81 (frequently
17 called her "sweetie").

18     When plaintiff did her mail run to the Sheriff's Department,
19 Conover began coming out of his office to greet her.  Pltf's Affid.
20 at ¶ 4.  He would inhale deeply and say things like "I thought that
21 was you.  I could smell you coming.  You smell good."  Id.; see
22 also Pltf's Depo. at p. 43 (noting verbal statements like "you
23 smell good"), p. 81 (frequently said "you smell good").

24     The verbal conduct was embarrassing and humiliating to
25 plaintiff, especially because it occurred in front of others.

26

27

28      [1]  Defendants make several evidentiary objections in their
   reply.  I address these at the end of this opinion.

3 - OPINION & ORDER

1  Pltf's Affid. at ¶ 4; Pltf's Depo. at p. 81.

2      Added to the verbal statements, Conover's conduct eventually
3  became physical when at one point, he started poking plaintiff in
4  the waist or ribs as he walked by.  Pltf's Affid. at ¶ 5; Pltf's
5  Depo. at p. 80 (Conover would run his finger up and down her back
6  and poke her; touched her on a number of occasions).  Although
7  infrequent, it made plaintiff uncomfortable.  Pltf's Affid. at ¶ 5;
8  Pltf's Depo. at p. 80.

9      Plaintiff also described that Conover would "hang out" at
10  plaintiff's desk in the front reception area of the DA's Office,
11  leaning on her desk for long periods of time, often just watching
12  and not making conversation.  Pltf's Depo. at p. 66.  No time frame
13  for this conduct is suggested in the deposition excerpt.  However,
14  in her affidavit, she notes that the "lurking" increased after May
15  2007, when Conover found out that plaintiff separated from her
16  husband.  Pltf's Affid. at ¶ 11.  She notes that at times, Conover
17  would pretend to read a newspaper, but she could tell he was
18  watching her.  Id.  It made it difficult for her to concentrate on
19  her work and made her uncomfortable to even answer the phone.  Id.

20      A county potluck occurred in December 2006.  Plaintiff was
21  cleaning up dishes in a small break room in the DA's Office when
22  Conover came up behind her and said she could go and do those at
23  his house.  Pltf's Depo. at p. 15.  At the same time, he put one
24  hand up by her left shoulder, and one hand on her waist and pressed
25  up against her.  Id. at p. 16.  The conduct lasted seconds.  Id.
26  Plaintiff told a coworker, Elizabeth Osborne, about the incident
27  and also spoke withe Deputy DA Leslie Wolfe, who suggested that
28  plaintiff report the incident to Eiesland.  Pltf's Affid. at ¶ 6;

4 - OPINION & ORDER

1  Pltf's Depo. at p. 16 (noting report to Osborne).

2      A week or two after this incident, plaintiff reported it to
3  Eiesland.  Pltf's Depo. at p. 17 (noting two weeks); Pltf's Affid.
4  at ¶ 7 (noting one week).[2]  This was the first time plaintiff had
5  spoken to Eiesland about Conover's conduct.  Pltf's Depo. at p. 18.
6  Plaintiff and Eiesland met in a back room because she did not want
7  Conover to know that she was complaining about him.  Id. at p. 19.
8  She was hoping that Conover would not learn that she had come
9  forward about it.  Id.  She explained that she did not want to get
10 anybody in trouble.  Id. at p. 20.

11     Plaintiff states that Eiesland told her that he would "handle
12 it" and would speak to Conover.  Pltf's Affid. at ¶ 7.  She further
13 states that Eiesland additionally said that he was glad plaintiff
14 let him know "because if some day you sue the County for sexual
15 harassment, I can say that you never let me know that something was
16 going on."  Id.

17     In deposition, plaintiff testified that she hoped that by
18 talking to Eiesland, he would talk to Conover and that "it" would
19 stop.  Pltf's Depo. at p. 21.  She wanted Eiesland to talk to
20 Conover about appropriate workplace behavior, but not let him know
21 that plaintiff was the one making the complaint.  Id.

22     Although Eiesland honored plaintiff's request, as far as she
23 knows, to keep her name out of it, she believes he spoke to
24 Sheriff's Department employees as a group and did not single out

25

26         [2]  Eiesland testified that plaintiff never reported this
   incident to him.  Eiesland Depo. at p. 30-31.  Defendants
27 acknowledge that plaintiff's version of the facts must be
   accepted as true for the purposes of summary judgment.  Deft's
28 Mem. at p. 3 n.1.

5 - OPINION & ORDER

1  Conover.  Id. at p. 22.  This was not what she wanted to have
2  happen.  Id.  However, when Eiesland told plaintiff that he had
3  spoken with everyone, she thanked him.  Id.  She hoped that "none
4  of this stuff" would happen again.  Id. at p. 23.

5      Plaintiff states that for about a month after Eiesland spoke
6  to the Sheriff's Department employees about behavior, Conover
7  stopped calling her sweetie and making other verbal comments.
8  Pltf's Affid. at ¶ 10.  He also quit touching her and poking her in
9  the sides.  Id.  Soon, however, Conover was again routinely calling
10 her "sweetie," telling her she smelled good, touching her
11 physically, and poking her in the waist and ribs.  Id.

12     Plaintiff described another incident in which she walked into
13 the Sheriff's Department and Conover asked her how she was doing.
14 Pltf's Depo. at p. 44.  Plaintiff responded she was fine.  Id.  As
15 Conover sat there, he turned around, tapped his leg, and said "it
16 would be better if you were sitting right here."  Id.  In her
17 deposition, plaintiff states that when this occurred, she just
18 chuckled and kept walking.  Id.  In her affidavit, she gives a few
19 more details, such as that Conover actually said "hi sweetie, how
20 are you doing," to which plaintiff responded fine and then asked
21 how he was doing.  Pltf's Affid. at ¶ 15.  Conover then spread his
22 legs wide open, patted the inside of his thigh, and said "I would
23 be doing better if you were sitting right here."  Id.  Plaintiff
24 was shocked by what he said and responded by stating "no, I am fine
25 where I'm at."  Id.  She chuckled nervously and left as quickly as
26 she could.  Id.  The deposition testimony does not pinpoint a date
27 for this incident, but plaintiff states in her affidavit that it
28 occurred in the spring of 2008.  Id.

6 - OPINION & ORDER

In deposition, Conover admitted that this incident occurred. Conover Depo. at pp. 75-76. Conover denied that there was any sexual overtone to that statement and stated that it was not of a sexual nature. Id. He stated he was joking around and thought he and plaintiff were friends. Id.

Plaintiff admits she never told Conover not to say "these" comments to her, referring presumably, to the comments about "sweetie" and "smelling good." Pltf's Depo. at p. 44. In her affidavit, she explains that she did not tell Conover to stop making sexual comments to her out of fear of his position as Chief Deputy. Pltf's Affid. at ¶ 16. She further states that she believed reporting this particular incident regarding the pat on the thigh to Eiesland would not do any good because her previous report had not been sufficient to stop the harassment. Id. She hoped that by not responding to Conover, he would get the message that his conduct was unwanted and offensive and that he would quit. Id.

According to plaintiff, in the spring of 2008, Conover's physical conduct toward her escalated. Pltf's Affid. at ¶ 13. He started to rub his fingers up and down her back over her bra strap. Id. This happened two or three times between an unspecified date in the spring of 2008 and November 2008. Id.

At the time plaintiff was working in the DA's Office, there was a surveillance camera recording her portion of the office. Pltf's Affid. at ¶ 14. It was a feed to the Sheriff's Department for security purposes. Id. In the spring of 2008, plaintiff learned that Conover was watching her on the surveillance cameras. Id. On one occasion, Conover actually called plaintiff at her desk

7 - OPINION & ORDER

to tell her he liked what she was wearing. Id. Plaintiff learned from other sheriff's deputies, including Detective Scattergood, that Conover would make a point of standing in front of the surveillance videos in order to watch plaintiff. Id. This made plaintiff even more uncomfortable with Conover's actions and it made it difficult for her to focus on her work, wondering if he was watching her on the video camera. Id.

The final incident of harassment by Conover noted by plaintiff occurred in November 2008. On November 12, 2008, plaintiff was standing at the front desk of the Sheriff's Department talking with Donna Lindsey and office manager Mary Drury. Pltf's Affid. at ¶ 19; Pltf's Depo. at p. 45. Conover walked into the office and as he passed plaintiff, he rubbed both of his hands up and down her sides, from her waist up and over her bra strap and back down again. Pltf's Affid. at ¶ 19; Pltf's Depo. at pp. 45-46.

This was embarrassing and humiliating to plaintiff. Pltf's Depo. at p. 46. She states that she and Drury looked at each other "kind of shocked." Id. She further states that nobody said much, and that it was just uncomfortable, and silent. Id. Conover kept walking, as did the other men who were with him. Id. She thought everyone there saw the whole thing and that it was very embarrassing. Id. In her affidavit, she states that she was so embarrassed that she did not know what to do and gave a startled jump.[3] Pltf's Affid. at ¶ 19. Id.

---

[3] In response to plaintiff's report of this incident, the Sheriff's Department made a copy of the surveillance video of the reception desk for the date and time in question. It is submitted as an exhibit by defendants in support of the motion. Deft's Exh. B. I have viewed the video. There, Conover enters

8 - OPINION & ORDER

Although plaintiff does not appear to address her report of this incident in her deposition testimony or her affidavit, a May 6, 2009 "Notice of Charges" to Conover from Eiesland notes that in November 2008, Eiesland received a complaint of possible unwanted contact between Conover and plaintiff.  Pltf's Exh. 9; see also Pltf's Depo. at p. 75 (stating that the DA's Office initiated an investigation of Conover based on her complaints).

Eiesland's May 6, 2009 "Notice of Charges" indicates that in accordance with Wasco County policy addressing investigations of command officers, he requested an investigation from outside the agency.  Pltf's Exh. 9.

Other exhibits submitted by plaintiff indicate that several different entities were involved in investigating plaintiff's complaints against Conover.  A summary prepared by the Oregon State Police states:

> This investigation was referred to the Oregon State Police by the Yamhill County District Attorney's Office after receiving a request from the Wasco County District Attorney's Office for review.  Since the initial investigative request from Yamhill County, Oregon Department of Justice [h]as received this case on referral from the Wasco County District Attorney.

> The case was originally investigated by the Hood River County Sheriff's Office and based on their investigation[,] additional follow up was requested to be completed by the Oregon State Police.

Pltf's Exh. 13 at p. 3.

Eiesland's May 6, 2009 "Notice of Charges" issued to Conover

the room, stands next to plaintiff at the reception desk, then passes by her.  Any touching by Conover of plaintiff is partially obscured by other people.  Contrary to plaintiff's assertion, however, the room does not appear to be in shock or quiet after Conover leaves.  Rather, plaintiff remains talking with employees, eating and laughing.

9 - OPINION & ORDER

states that Conover was charged with violating Sheriff's Department policy A05.00 and A05.01 by allegedly discriminating against plaintiff by subjecting her to unwanted physical touching in the workplace and thereby potentially creating a hostile work environment.  Pltf's Exh. 9.  Afer reciting the facts of the complaint by plaintiff, and that Eiesland had requested an outside agency investigate the matter, Eiesland states that the investigation had concluded.  Id.  He sustained the allegation that Conover touched Mendoza inappropriately, in violation of County policy.  Id.  Eiesland then writes that it is his determination that discipline up to and including termination is warranted and thus, by policy, Conover was entitled to meet with Eiesland to discuss the charges and to present any mitigating or extenuating circumstances.  Id.  He instructed Conover to meet with him on May 8, 2009.  Id.

Also on May 6, 2009, plaintiff's attorney wrote a formal tort claim notice to Eiesland.  Exh. C to Eiesland Declr.  There, in addition to notifying Eiesland of her intent to file a civil action, plaintiff's counsel notes that it was his understanding that Conover had returned to his duties from administrative leave. Id. at p. 2.  I see no other evidence in the record regarding the fact that Conover had been placed on administrative leave.

On May 8, 2009, Eiesland issued a formal letter of reprimand to Conover.  Pltf's Exh. 10.  In pertinent part, Eiesland wrote:

> After careful consideration it is my determination that just cause exists to support the disciplinary measure of placing an official Letter of Reprimand in your personnel file.  I am also requiring you to attend and successfully complete a Sexual Harassment training approved by me as soon as possible, but in any case no later than six months from today's date.  After you satisfactorily

complete this course, and after one year of good conduct on your part, [this letter will be removed from your file] or [I reserve the right to place this letter in a sealed envelope and return it to your file. In that case, it will be opened only with your consent, or by court order, or if needed to defend Wasco County from legal action, or upon a finding that you have again violated policy.]

Id.[4]

Conover's conduct caused plaintiff to dread coming to work and made her want to quit her job. Pltf's Depo. at p. 55; Pltf's Affid. at ¶ 17. Conover's harassment was part of the reason she eventually left her job with the Wasco County DA's Office. Pltf's Depo. at pp. 6-7. Plaintiff now works for the City of The Dalles as a department secretary. Pltf's Depo. at p. 4. She receives benefits similar to those she received at Wasco County and earns a higher rate of pay. Id. at p. 6.

B.  Other Incidents Involving Conover

In a March 30, 2009 supplemental incident report prepared by Oregon State Police officer Mitchell Meyer, Meyer reports that he and Detective Kipp interviewed Deputy Birchfield who stated that Conover had told him that he made a traffic stop on a vehicle because the girl driving was "hot." Exh. 5 to Malmsheimer Declr. at p. 3.

A different supplemental incident report completed by Kipp in March 2009, contains a statement by Curt McConnell given during an interview by Meyer and Kipp. Exh. 6 to Malmsheimer Declr. at p. 6. At the time, McConnell had been a deputy sheriff in the Sheriff's

---

[4] It looks as if Eiesland should have chosen one of the two options regarding the letter, but I quote it here exactly as it appears in the exhibit.

11 - OPINION & ORDER

Department for five years.  Id.  McConnell stated that he had observed Conover come out of his office when attractive women come to the Sheriff's Department, and go to the lobby.  Id. at p. 7.  He noted that Conover had sometimes made inappropriate jokes in front of mixed company that included women.  Id.

Also in this incident report is a statement by Wasco County Sheriff's Department Detective Sergeant Terry Scattergood, a thirty year Sheriff's Department employee.  Id. at p. 2.  Scattergood stated that in the past, Conover had made it clear to him that Conover wanted to get plaintiff "in the sack."  Id. at p. 3.  Conover told Scattergood that he wanted to touch plaintiff's breasts.  Id.  Conover also told Scattergood that women were only good for one thing and that's "fucking."  Id. at p. 4.

In his deposition, Conover explained that when he was appointed Chief Deputy in 2004, there was some resentment that Eiesland had appointed him and at a staff meeting, Eiesland asked if anyone had anything to say about the appointment.  Conover Depo. at p. 22.  In response, Sergeant Alan Wiebe complained about the sexual nature of Conover's conversations.  Id. at pp. 23-24.  Conover received no training, discipline, or reprimand in response to the complaint, and there was no investigation.  Id. at p. 24.

Conover also testified in deposition that he once gave Deputy DA Wolfe (a woman), a packet of penis-shaped breath mints as a "joke" to break the tension surrounding the sex cases they were working on together.  Id. at pp. 40-42.

Eiesland himself told sexual jokes to Conover.  Eiesland Depo. at p. 21.

/ / /

12 - OPINION & ORDER

STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.'"  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991) (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987)).  The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial.  Celotex, 477 U.S. at 322-23.

The substantive law governing a claim determines whether a fact is material.  T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  All reasonable doubts as to the existence of a genuine issue of fact must be resolved against the moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).  The court should view inferences drawn from the facts in the light most favorable to the nonmoving party.  T.W. Elec. Serv., 809 F.2d at 630-31.

If the factual context makes the nonmoving party's claim as to

13 - OPINION & ORDER

1   the existence of a material issue of fact implausible, that party

2   must come forward with more persuasive evidence to support his

3   claim than would otherwise be necessary.  Id.; In re Agricultural

4   Research and Tech. Group, 916 F.2d 528, 534 (9th Cir. 1990);

5   California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics,

6   Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).

7                          DISCUSSION

8        Plaintiff brings the following claims for relief:  (1) three

9   claims under Oregon Revised Statute § (O.R.S.) 659A.030, all

10  brought against Wasco County:   Count One for hostile work

11  environment based on sex; Count Two for disparate treatment based

12  on sex; and Count Three for retaliation for plaintiff's reports of

13  discrimination; (2) a section 1983 claim against Conover for

14  violating plaintiff's rights to equal protection under the

15  Fourteenth Amendment; and (3) a section 1983 claim against Eiesland

16  for violating plaintiff's rights to free speech under the First

17  Amendment.

18       In the present motion, defendants move for partial summary

19  judgment as follows:  (1) on the portions of plaintiff's state law

20  claims based on actions occurring more than 180 days prior to her

21  tort claim notice because they are time barred; (2) on the portion

22  of the section 1983 claim against Conover occurring more than two

23  years before the case was filed; and (3) on the sex harassment

24  hostile environment claims brought against Conover under O.R.S.

25  659A.030 and section 1983 because the alleged conduct was not

26  sufficiently severe and pervasive to constitute actionable sexual

27  harassment.  While the written motion appeared to be against other

28  claims as well, at oral argument, defendants confirmed that their

14 - OPINION & ORDER

motion is limited to the sexual harassment portion of plaintiff's claims and is not directed to any claim based on a disparate treatment or retaliation theory.

I.   Timeliness of Claims

     A.   State Law Claims

     The notice provisions of the Oregon Tort Claims Act (OTCA) apply to the state law claims in this case.   Reyna v. City of Portland, No. CV-02-980-JO, 2005 WL 708344, at *2 (D. Or. Mar. 28, 2005) ("Plaintiff's ORS Chapter 659A state law claims . . . all are subject to the 180-day notice requirement of the Oregon Tort Claims Act ('OTCA'), ORS 30.275(2)(b)") (citing Brinkley v. Oregon Health Sci. Univ., 94 Or. App. 531, 536, 766 P.2d 1045 (1988) (state law disability discrimination claim a "tort" subject to OTCA notice requirement)).

     The OTCA requires that notice of the claim be given to the public body "within 180 days after the alleged loss or injury." O.R.S. 30.275(2)(b).   Defendants argue that to the extent plaintiff's state law sexual harassment claims are based on conduct occurring before November 7, 2008, 180 days before the May 6, 2009 tort claim notice, they are time barred.[5]

     B.   Section 1983 Claim

     The statute of limitations for filing a section 1983 action is

---

     [5]   In their written materials, defendants made the same argument as to the allegations supporting the retaliation claim, contending that any such allegations originating before May 1, 2009, 180 days before the October 28, 2009 retaliation tort claim notice, are time barred.   In light of defendants' counsel's representation at oral argument that the present motion is limited to the sexual harassment allegations, I do not further consider the retaliation argument.

15 - OPINION & ORDER

determined by the forum state's statute of limitations for personal

injury actions.  Wilson v. Garcia, 471 U.S. 261, 276 (1985).  In

Oregon, the relevant statute of limitations is two years.  O.R.S.

12.110(1); Sain v. City of Bend, 309 F.3d 1134, 1139 (9th Cir.

2002).

This case was filed on November 4, 2009.  Defendants argue

that any alleged incidents that occurred before November 4, 2007,

may not serve as the basis for a section 1983 claim.

C.  Discussion

Plaintiff argues that the continuing violation theory applies

to both the state claims and the section 1983 claim, and thus,

Conover's entire course of conduct is actionable.  I agree  with

plaintiff.

In a recent decision, Judge Papak explained that

> [t]he Supreme Court . . . has limited the reach of the
> continuing violations doctrine, holding that "discrete
> discriminatory acts are not actionable if time barred,
> even when they are related to acts alleged in timely
> filed charges."  Nat'l R.R. Passenger Corp. v. Morgan,
> 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106
> (2002).  A discrete act is an incident of discrimination,
> "such as termination, failure to promote, denial of
> transfer, or refusal to hire," that constitutes a
> separate, actionable "unlawful employment practice."  Id.
> at 114.  In contrast, the continuing violation doctrine
> applies to hostile work environment claims, which by
> their nature consist[] of multiple related actions that
> by themselves may not constitute discrimination.  Id. at
> 122. . . .  Oregon courts draw a similar distinction
> between discrete acts of discrimination and a systematic
> pattern of conduct.  BoardMaster Corp. v. Jackson County,
> 224 Or. App. 533, 551, 198 P.3d 454 (2008); see also
> Davis v. Bostick, 282 Or. 667, 674, 580 P.2d 544 (1978)
> (where evidence showed that plaintiff was harmed by each
> individual alleged wrongful act, she was not "entitled to
> ride out the storm and lump sum her grievances.").

Arbigon v. Multnomah County, No. CV-09-311-PK, 2010 WL 2038839, at

*14 (D. Or. May 20, 2010) (finding race discrimination claim time

16 - OPINION & ORDER

barred to certain extent because it was based on series of discrete adverse employment actions); see also Picouto v. Western Star Truck Plant Portland LLC, No. CV-08-807-ST, 2010 WL 3607956, at *25 (D. Or. May 27, 2010) (in race, national origin, and gender discrimination claim, discrete acts occurring more than one year prior to the filing of an administrative agency charge of discrimination, were time barred).

In Morgan, the Supreme Court, as noted by Judge Papak, curtailed the use of the continuing violation theory in some contexts. In doing so, however, the Court made an important distinction between discrimination and retaliation claims on the one hand, and hostile environment claims on the other. 536 U.S. at 115. "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." Id. "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Id. at 117. Because a hostile environment claim "encompasses a single unlawful employment practice," the employee "need only file a charge within [the applicable limitations period] of any act that is part of the hostile work environment." Id. at 117, 119.

As Judge Stewart explained in a 2008 case, "a hostile environment claim seems to be exactly the kind of claim which recovery is for the cumulative effect of wrongful behavior." Atwood v. Oregon Dep't of Transp., No. CV-06-1726-ST, 2008 WL 803020, at *13 (D. Or. Mar. 20, 2008) (internal quotation omitted). As long as the facts offered show that the actions are part of the same unlawful employment practice, meaning actions

17 - OPINION & ORDER

taken because of the fact that the plaintiff was a woman, or in Judge Stewart's case was disabled, the continuing violation theory recognized in Morgan, applies. Id.

Here, the continuing violation theory, even as curtailed by Morgan, applies to plaintiff's sexual harassment claims and thus, all of Conover's conduct toward her should be considered for liability purposes on those claims. The theory applies equally to the state O.R.S. 659A.030 sex harassment claim and to the section 1983 claim. See Gutowsky v. County of Placer, 108 F.3d 256, 259 (9th Cir. 1997) (continuing violation theory applied to section 1983 claim); Atwood, 2008 WL 803020, at *10-13 (applying continuing violation theory to state statutory claim brought under the OTCA).

The alleged acts include ongoing sexual joking and banter, Conover calling plaintiff "sweetie," telling plaintiff she "smelled good" while sniffing the air, lingering near plaintiff's desk, pressing up against her at the December 2006 potluck, watching her at her desk on the surveillance camera, poking her in the ribs, telling her he would be better if she sat "here" while tapping his thigh, and rubbing his hands up her back and along her bra strap, including the November 2008 incident for which he was disciplined.

In her deposition testimony, plaintiff expressly stated that Conover's comments of calling her "sweetie" and telling her she "smelled good" were "very frequent." Pltf's's Depo. at p. 81. The instances of running his finger up and down her back and poking her were not frequent, but still occurred on a "number of occasions" and made plaintiff uncomfortable. Id. It appears to be an escalation of the alleged conduct. Plaintiff's affidavit provides

18 - OPINION & ORDER

1  similar testimony.  Pltf's Affid. at ¶¶ 3,4, 5.

2       I agree with plaintiff that these acts as alleged, are a

3  series of closely related occurrences, similar in nature, that

4  continued over an extended period of time, and which were directed

5  at plaintiff by the same person.  As the Supreme Court noted in

6  Morgan, the alleged facts establish a claim "composed of a series

7  of separate acts that collectively constitute one 'unlawful

8  employment practice.'"  Id. at 117.  It is the cumulative harm

9  produced by the series of ongoing, related acts committed by

10 Conover that constitutes the unlawful employment practice.

11      I deny defendants' motion on the timeliness issue.

12 II.  Hostile Environment

13      Defendants' argument directed to the merits of the hostile

14 environment claims (Count One of the First Claim of Relief based on

15 O.R.S. 659A.030, and the section 1983 equal protection claim), is

16 premised on defendants prevailing on the timeliness issue.  That

17 is, defendants argue that the only actionable portion of the sexual

18 harassment claim is the November 12, 2008 allegation that Conover

19 inappropriately touched plaintiff in the front reception office of

20 the Sheriff's Department.  Defendants contend that that single

21 allegation is insufficient to establish a hostile work environment.

22      To survive summary judgment on a hostile work environment

23 claim, plaintiff must "establish a pattern of ongoing and

24 persistent harassment severe enough to alter the conditions of

25 employment."  Nichols v. Azteca Restaurant Enters, Inc., 256 F.3d

26 864, 871 (9th Cir. 2001) (internal quotation omitted).  The

27 harassment "must be both objectively and subjectively offensive,

28 one that a reasonable person would find hostile or abusive, and one

1    that the victim in fact did perceive to be so." <u>Faragher v. City</u>
2    <u>of Boca Raton</u>, 524 U.S. 775, 787 (1998).    The conduct must
3    constitute discrimination because of sex.    <u>Oncale v. Sundowner</u>
4    <u>Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998).

5        When determining whether a workplace is hostile, the court
6    considers all of the circumstances, including "the frequency of the
7    discriminatory conduct; its severity; whether it is physically
8    threatening or humiliating, or a mere offensive utterance; and
9    whether it unreasonably interferes with an employee's work
10   performance." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23
11   (1993).    "[S]imple teasing, offhand comments, and isolated
12   incidents (unless extremely serious) will not amount to
13   discriminatory changes in the terms and conditions of employment."
14   <u>Nichols</u>, 256 F.3d at 872 (internal quotation omitted).    However,
15   "no single factor is required," <u>Harris</u>, 510 U.S. at 23, and "[t]he
16   required level of severity or seriousness varies inversely with the
17   pervasiveness or frequency of the conduct." <u>Nichols</u>, 256 F.3d at
18   872 (internal quotation omitted).

19       "A working environment is abusive if hostile conduct pollutes
20   the victim's workplace, making it more difficult for her to do her
21   job, to take pride in her work, and to desire to stay on in her
22   position." <u>Davis v. Team Elec. Co.</u>, 520 F.3d 1080, 1095 (9th Cir.
23   2000) (internal quotation omitted).    "Offensive comments do not all
24   need to be made directly to an employee for a work environment to
25   be considered hostile."    <u>Id.</u>[6]

26   ────────────────────

27       [6]  Although these standards have been developed in the Title
28   VII context, they apply to the O.R.S. 659A.030 and section 1983
     claims.    <u>Keyser v. Sacramento City Unified Sch. Dist.</u>, 265 F.3d

1    Given my ruling on the timeliness issue, I reject defendants'
2    argument that the only conduct relevant to the merits of the sexual
3    harassment claim is the November 2008 incident.  Rather, all of
4    Conover's conduct directed toward plaintiff is properly considered
5    for liability purposes.  I agree with plaintiff that the evidence
6    here is sufficient to survive a summary judgment motion as to the
7    hostile environment claim.

8    As plaintiff notes, over a period of two years, Conover
9    frequently called her "sweetie," and frequently told her she
10   "smelled good" while sniffing the air.  In the context of Conover's
11   other actions, these terms took on a demeaning sexual connotation.
12   Although Conover denies that many of his comments and actions were
13   intended as sexual conduct, his actions speak for themselves and a
14   reasonable jury could conclude that much of his conduct was
15   motivated by plaintiff's gender.  Notably, his gift to a female
16   lawyer in the District Attorney's Office of penis shaped breath

17

18   741, 754 (9th Cir. 2001) (noting summary judgment decisions
     regarding section 1983 claims are "remarkably similar" to their
19   Title VII counterparts); Lowe v. City of Monrovia, 775 F.2d 998,
     1011 (9th Cir. 1985) (holding that plaintiff had established a
20   triable issue under Title VII, and therefore also established a §
     1983 issue); Jaurrieta v. Portland Pub. Schs., No. CV-00-1238-ST,
21   2001 WL 34041143, at *7 and n.12 (D. Or. Dec. 14, 2001)
22   (analyzing O.R.S. 659.030 hostile environment claim under Title
     VII standards and noting that Oregon courts generally consider
23   and adopt federal case law regarding Title VII), adopted by Judge
     Brown (D. Or. Feb. 7, 2002); Williams v. Multnomah Educ. Serv.
24   Dist., No. CV-97-1197-ST, 1999 WL 454633, at *4 (D. Or. Apr. 14,
25   1999) ("the status of the § 1983 equal protection clause claim
     generally depends on the outcome of the title VII analysis.");
26   Logan v. West Coast Benson Hotel, 981 F. Supp. 1301, 1319 (D. Or.
     1997) (in analyzing Oregon discrimination claims under Chapter
27   659, Oregon courts have looked to Title VII cases for guidance
     because Oregon statutes are "wholly integrated and related" to
28   Title VII).

21 - OPINION & ORDER

mints, while unknown to plaintiff, bears on the credibility of Conover's testimony that his conduct toward plaintiff was not sexual. Additionally, a jury could easily determine that plaintiff's reaction to Conover's statements was influenced by having heard that Conover was a "predator."

Other non-physical harassment included Conover watching plaintiff on the security camera, the come-on when Conover tapped his thigh and said he would be better if plaintiff were sitting there, and lingering at plaintiff's desk while she worked. In addition, Conover occasionally poked and touched her. Then there are the two incidents of more offensive touching first in December 2006 when Conover pressed up against plaintiff from behind while holding her shoulder and waist and telling her that she could wash the dishes at his house, and then in November 2008 when Conover, who had already allegedly occasionally been rubbing his hand along her bra strap, allegedly rubbed his hands up plaintiff's back along her bra strap, and back down again, this time in the front reception area of the Sheriff's Department.

At a minimum, this pattern of conduct creates a jury question as to whether a reasonable woman would have felt that her work environment was hostile. The evidence reveals a combination of (1) what could be viewed as somewhat innocuous, but ongoing, behavior such as the "sweetie" and "smell good" comments and the infrequent, but objectionable, poking in the ribs or back, with (2) more predatory behavior of watching her on the surveillance camera, lingering at her desk, and the December 2006 potluck incident. When this conduct is considered along with physical touching that escalated beyond the poking to rubbing hands up and down her back

and along her bra, the record shows both frequent and serious conduct establishing a "pattern of ongoing and persistent harassment severe enough to alter the conditions of employment." The evidence further establishes harassment which a reasonable person would have found hostile and abusive, or at least raises a jury question on that issue.

The evidence also shows that plaintiff subjectively perceived the conduct as hostile and abusive. The evidence shows that the harassment made plaintiff's job more difficult. E.g., Pltf's Affid. at ¶ 14 (knowing that Conover was watching her on the surveillance camera made it made it difficult for her to focus on her work, wondering if he was watching her on the video camera); Pltf's Affid. at ¶ 11 (Conover's lingering and lurking at her desk made it difficult for her to concentrate on her work and made her uncomfortable to even answer the phone); Pltf's Depo. at pp. 82-83 (plaintiff was scared of Conover after the December 2006 potluck incident, feared being alone with him, was embarrassed and uncomfortable); Pltf's Affid. at ¶¶ 5, 20 (same); Pltf's Affid. at ¶ 20 (Conover's treatment changed the way plaintiff thought about her job from loving working with the Sheriff's Deputies to questioning if she could trust law enforcement officers; feared being alone in an elevator or office because of anticipating that Conover would "suddenly appear" and say or do something inappropriate; dreaded going to work; felt stressed and lost sleep; was reduced to tears); Pltf's Depo. at p. 55 (things got to the point where she wanted to quit her job).

Defendants point to evidence in the record which they contend shows that plaintiff was not subjectively offended by Conover's

23 - OPINION & ORDER

actions.  For example, defendants note that plaintiff laughed or
chuckled in response to the incident when Conover patted his thigh.
Defendants also point to the video of the November 2008 incident
which shows plaintiff, and others, remaining in the Sheriff's
Department reception area and talking following Conover's alleged
rubbing of her back and bra strap.  But, on a summary judgment
motion, the evidence is viewed in the light most favorable to the
non-moving party and plaintiff's affidavit and deposition testimony
regarding the effect of Conover's actions on her must be accepted
as true.  Moreover, plaintiff describes her reaction to the "thigh"
incident as a nervous chuckle.  Given the range of possible human
emotional responses to uncomfortable events, the jury should
evaluate plaintiff's response to these incidents to determine if
she was offended or not.

The same is true of plaintiff having herself occasionally
engaged in office-based sexual joking and her having raised her
shirt to Eiesland.  An argument can be made that a person engaging
in such behavior may not be offended by actions such as those
perpetrated by Conover.  An equally plausible argument may be made,
however, that being specifically targeted by a high ranking person
in the Sheriff's Department for repeated offensive and
inappropriate verbal conduct and sexualized touching is behavior of
a completely different kind which may in fact be offensive to a
person who is otherwise comfortable participating in certain other
activities of a sexual nature.  Because differing reasonable
inferences may be drawn from these facts, the determination is
properly left to the jury.  I cannot say that all jurors would
always find that a female plaintiff's one-time inappropriate

24 - OPINION & ORDER

barring of her chest briefly to one employee means she welcomes all manner of alleged sexual harassment from a different employee.

Defendants argue that because Conover was not a supervisor with immediate or successively higher authority over plaintiff, he cannot subject the County to vicarious liability. McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1119 (9th Cir. 2004) ("An employer's liability for harassing conduct is evaluated differently when the harasser is a supervisor as opposed to a coworker. . . . An employer is vicariously liable for a hostile environment created by a supervisor, although such liability is subject to an affirmative defense. . . . If, however, the harasser is merely a coworker, the plaintiff must prove that the employer knew or should have known of the harassment but did not take adequate steps to address it.") (internal quotation and citations omitted).

The section 1983 claim is brought against Conover directly, so the issue of the County's liability relates only to plaintiff's O.R.S. 659A.030 claims. Two recent decisions from this Court have applied the federal standards on this issue to state law claims under O.R.S. 659A.030. Dawson v. Entek Intern., 662 F. Supp. 2d 1277, 1288-91 (D. Or. 2009) (discussing employer's remedial measures in context of O.R.S. 659A.030 claim); Delima v. Home Depot U.S.A., Inc., 616 F. Supp. 2d 1055, 1090 (D. Or. 2008) (analyzing whether employer took care "to prevent and promptly correct any sexually harassing behavior" in context of Title VII and O.R.S. 659A.030 claims); see also Harris v. Pameco Corp., 170 Or. App. 164, 177-78, 12 P.3d 524, 533 (2000) (discussing remedial measures taken by employer in context of analyzing plaintiff's O.R.S. 659.030 claim); Fred Meyer, Inc. v. Bureau of Labor & Industries,

25 - OPINION & ORDER

152 Or. App. 302, 311, 954 P.2d 804, 809 (1998) (same).

Although the record is a bit unclear as to whether plaintiff considers Conover to be equivalent to a co-worker or had some supervisory authority over her, plaintiff does not appear to argue in response to this motion that the County is vicariously liable for Conover's conduct because he is a "supervisor." Thus, the issue presented here is the liability of the County for acts performed by a co-worker.

"An employer is liable for the hostile work environment created by a co-worker unless the employer takes adequate remedial measures in order to avoid liability." Nichols, 256 F.3d at 875 (internal quotation, ellipsis, and brackets omitted). In the Ninth Circuit,

> remedies for sexual harassment should be reasonably calculated to end the harassment. . . . The reasonableness of the remedy depends on its ability to: (1) stop harassment by the person who engaged in harassment; and (2) persuade potential harassers to refrain from unlawful conduct. . . . When the employer undertakes no remedy, or where the remedy does not end the current harassment and deter future harassment, liability attaches for both the past harassment and any future harassment.

Id. at 875-76 (internal quotations, citations, and brackets omitted).

Defendants note that plaintiff complained a single time to Eiesland in December 2006[7], and indicated to him she wanted the matter to be handled quietly. Defendants argue that Eiesland

_____

[7] As indicated above, Eiesland states that plaintiff did not report the December 2006 incident to him, but instead, reported the "thigh" incident. For the purposes of this motion, defendants assume that plaintiff's report followed the December 2006 incident and they make their argument based on that assumption.

26 - OPINION & ORDER

handled the matter appropriately by holding a meeting on sexual harassment for his employees.  Then, defendants note that plaintiff did not formally complain of the harassment or otherwise provide the County with any indication of the alleged harassment until she filed a tort claim in May 2009, after which the County immediately responded to her allegations once it became aware of them.

According to plaintiff's description of her report of the December 2006 potluck incident, she asked Eiesland to speak directly to Conover, Eiesland said that would "handle it," and would speak to Conover, but then, Eiesland did not follow through with this commitment.  Rather, he brought his office together and told them to watch what they were saying because some people could become offended.  Pltf's Affid. at ¶ 8; Pltf's Depo. at pp. 22-23.

Plaintiff notes that Eiesland's handling of plaintiff's complaint was inconsistent with plaintiff's wishes, and, was a violation of the Sheriff's Department policy regarding how to handle harassment allegations because that policy requires the Sheriff to "speak with the alleged harasser stating the nature of the complaint," and that "in all instances," the Sheriff shall "contact the . . . complainant prior to implementing a course of action . . . to ensure that the intended course of action is understood and acceptable." Exh. 8 to Malmsheimer Declr. at pp. 2, 3.

Additionally, given that the harassment by Conover continued after Eiesland addressed the Sheriff's Department generally, plaintiff argues that the attempt to stop the harassment was insufficient as a matter of law.  As the Ninth Circuit noted in a 1997 case, employers "send the wrong message to potential harassers

27 - OPINION & ORDER

when they do not discipline employees for sexual harassment" and the failure to "take even the mildest form of disciplinary action renders any claim for remedial action inadequate." <u>Yamaguchi v. United States Dep't of Air Force</u>, 109 F.3d 1475, 1483 (9th Cir. 1997) (internal quotations omitted).

Finally, plaintiff points to the facts showing that the County was aware of Conover's "proclivities towards inappropriate sexual conduct in the workplace." Pltf's Mem. at p. 22. Plaintiff notes Conover's conducting traffic stops on "hot" women, that upon Conover's promotion to Chief Deputy, Wiebe complained about Conover's sexual conversations, and that Conover was known to be a "predator." And, plaintiff further notes that the County and Eiesland contributed to the very atmosphere that permitted the harassment of plaintiff to occur in the first place. Eiesland admitted to engaging in sexual joking with Conover and knew that sexual banter was a routine feature in the office.

The record creates an issue of fact as to whether the County's response to plaintiff's complaint was adequate. Even without the evidence of Conover's reputation or Eiesland himself engaging in sexual jokes and tolerating an office with sexual banter, the fact that Eiesland did not speak directly to Conover when plaintiff complained to him, the fact that his failure to do so violated County policy, and the fact that the harassing conduct did not stop, are enough to create an issue of fact as to whether the County's remedies were reasonably calculated to end the harassment and stop it from occurring in the future.

I deny defendants' motion for summary judgment on the sexual harassment claims.

28 - OPINION & ORDER

III.   Evidentiary Objections

In their reply memorandum, defendant raise several evidentiary objections.   Defendants'  presentation  of  its  objections  is confusing for two reasons.  First, defendants raise objections to assertions  contained  in  plaintiff's  concise  statement  of  fact, which  are  not  evidence.   Second,  defendants  repeatedly  raise  a category or type of objection to, for example, statements contained within reports, without citing to each statement and explaining the objection for that particular statement.  Defendants' failure to do this has created an unnecessary burden for the court.

As  to  the  hearsay  objections,  any  statement  by  Conover  is admissible  under  Federal  Rule  of  Evidence  801(d)(2)(A),  as  a statement by a party-opponent.   The police investigation reports themselves  are  admissible  under  Rule  803(6),  for  records  of regularly  conducted  activity,  or  possibly  Rule  803(8),  for  public records  and  reports.   Additionally,  statements  made  by  other Sheriff's  Department  employees  are  likely  admissible  under  Rule 801(d)(2)(D),  as  statements  made  by  a  party's  agent  or  servant concerning  a  matter  within  the  scope  of  the  agency  or  employment, made during the existence of the relationship.

Thus,  the  following  statements  noted  in  this  Opinion,  and relied  on  in  my  discussion,  are  not  barred  by  the  hearsay  rule: (1)  Wiebe's 2004 complaint regarding Conover's promotion because of the sexual nature of Conover's conversations; (2) Birchfield's statement in the March 30, 2009 Oregon State Police incident report that  Conover  told  him  that  he  made  a  traffic  stop  on  a  vehicle because  the  girl  driving  was  "hot";  (3)  McConnell's  statement  in another  Oregon  State  Police  incident  report  that  he  had  observed

29 - OPINION & ORDER

1  Conover come out of his office and go to the lobby when attractive
2  women came to the Sheriff's Department; and (4) Scattergood's
3  statement in the March 2009 Oregon State Police incident report
4  that Conover told Scattergood he wanted to touch plaintiff's
5  breasts, that women were only good for "fucking," and that he
6  wanted to get plaintiff "in the sack".

7       Additionally, some of the challenged statements are not
8  offered for the truth of the matter asserted, and thus, are not
9  hearsay for that reason as well.  For example, Wiebe's statement
10 expressing concern over Conover's promotion is not offered for the
11 truth of the matter asserted, but to show that the County had
12 knowledge of Conover's alleged behavior.  Similarly, the statement
13 by the DA Office employee to plaintiff that Conover was a predator
14 is not offered to prove the truth of the matter, but to show the
15 effect of that statement on plaintiff and how she subsequently
16 viewed much of Conover's conduct.

17      Defendants also argue that many of these statements are not
18 relevant and are inadmissible on that basis.  Wiebe's statement is
19 relevant to the County's knowledge that Conover may have engaged in
20 problematic behavior.  Wiebe made the statement sometime in 2004.
21 Plaintiff began working for the County in August 2004.  Thus, the
22 timing of Wiebe's statement shows that the County knew of a
23 potential issue with Conover's conduct even before plaintiff
24 complained in December 2006 about the potluck incident.

25      The other statements are also relevant to the County's
26 knowledge because the fact that there are several Sheriff's
27 Department employees offering specific statements about Conover's
28 sexualized conduct and statements creates an inference that

30 - OPINION & ORDER

Conover's actions permeated the Sheriff's Department, putting the County on notice that Conover's behavior may be problematic. Finally, Conover's statements to Scattergood about plaintiff, obviously made while plaintiff was employed by the County, are relevant to the intent behind Conover's conduct toward plaintiff.

I agree with defendants that because these statements were not directed at plaintiff, and there is no evidence that she was made aware of them, they are not relevant to the determination of plaintiff's subjective perception of harassment.   But, they are relevant to assessing the County's knowledge and the reasonableness of its actions.   Finally, they are relevant to the objective assessment of Conover's behavior.   Given Conover's denial that his actions toward plaintiff were sexual in nature, these statements are relevant to the jury's determination of whether a reasonable woman would have perceived his actions as offensive because they tend to show that Conover's conduct was often sexualized.   As noted above, this is also why the evidence that Conover gave Wolfe penis shaped breath mints is relevant.

Defendants further challenge the basis for plaintiff's statements regarding Conover's presence at plaintiff's desk in the reception area of the DA's Office.   First, in her deposition, plaintiff describes Conover's actions, but she relates no out of court statements made by either Conover or herself.   Rather, she describes, based on her personal knowledge, that he "hung out" at her office and made her uncomfortable at times.   Pltf's Depo. at p. 66.   She further describes that she became uncomfortable when he stayed for long periods of time, not conversing, but just watching her.   Id.   This testimony presents no hearsay issue and it is

31 - OPINION & ORDER

1   obviously relevant.

2       Next, in her affidavit, she describes how Conover's presence

3   at her desk became more frequent after plaintiff separated from her

4   husband.  Pltf's Affid. at ¶ 11.  She recites that Conover would

5   lurk around her work area and pretend he was reading a newspaper,

6   but she could tell he was watching her.  Id.  These statements are

7   descriptions of events based on plaintiff's personal observation of

8   them.

9       Defendants specifically object to plaintiff's statements that

10  Conover  had  no  Sheriff's  Department  business  purpose  while

11  frequenting  plaintiff's  work  area.   Because  the  basis  of

12  plaintiff's knowledge regarding whether Conover had a work purpose

13  for being in the area of plaintiff's desk is not clear on the

14  record,  I  do  not  rely  on  these  particular  statements  of

15  plaintiff's.  I also do not rely on her statements that other DA

16  Office employees would "run interference" for her when Conover

17  stayed at her desk for too long because the basis of her knowledge

18  of the motivation of those employees is also not clear in the

19  record.

20      Additionally,  defendants  challenge  the  admissibility  of

21  plaintiff's  statements  regarding  Conover  watching  her  on  the

22  surveillance camera.  To the extent other employees told plaintiff

23  that she was being watched, such statements are not hearsay because

24  they are offered for the purpose of showing plaintiff's state of

25  mind, not the truth of the matter asserted.  Moreover, plaintiff

26  states that Conover himself made statements that he was watching

27  her on the camera, and he called her to tell her he liked what she

28  was wearing.  As with other statements by Conover, these are not

32 - OPINION & ORDER

hearsay under Rule 801(d)(2)(A).

Finally, defendants argue that certain statements in plaintiff's affidavit must be disregarded because they conflict with her deposition testimony. Defendants offer a generalized argument that plaintiff's affidavit contains "multiple self-serving statements" which "contradict and exaggerate the events she described in her deposition testimony." Defts' Reply Mem. at p. 4.

But, the only specific challenge defendants raise is to the following:

> In the spring of 2008, Chief Deputy Conover began to start rubbing his fingers up and down Ms. Mendoza's back over her bra strap. Mendoza Aff., ¶ 13; Mendoza Dep. at 80-83.

Pltf's Supp'l CSF at ¶ 6.

Defendants raise an objection to a factual assertion, which, as noted above, is not evidence. I assume that defendants intended to object to paragraph 13 of plaintiff's affidavit because it allegedly contradicts her deposition testimony on this issue.

The relevant portion of the affidavit states:

> During this time, in the Spring of 2008, Chief Deputy Conover's physical conduct towards me began to escalate. Chief Deputy Conover started rubbing his fingers up and down my back over my bra strap. This occurred two or three times before the final incident in November of 2008.

Pltf's Affid. at ¶ 13.

The cited deposition testimony states:

> Q: . . . you also described two incidents of touching, the two that I just mentioned, both the potluck and the front desk. Were there any other incidents where Mr. Conover touched you physically in a way that made you feel uncomfortable?

> A: No.

> Q: Did he ever run his finger up and down your back or

33 - OPINION & ORDER

1      anything like that?

2      A:  Yes.

3      Q:  Or poke you?

4      A:  Yes.

5      Q:  And did those instances make you feel uncomfortable?

6      A:  Yes.

7      Q:  And how frequently did that occur?

8      A:  It wasn't frequent.  I don't' know.

9      Q:  Can you estimate the number of times that he did?

10     A:  I don't' know.

11     Q:  Fair enough.  And would that have occurred after the
       potluck incident?
12
       A:  Yes.
13
       Q:  So between the potluck incident and the incident at
14     the front desk –

15     A:  Yes.

16     Q:  – there were a number of occasions where he touched
       you and made you uncomfortable?
17
       A:  Yes.
18
Pltf's Depo. at pp. 80-81.
19
       An  issue  of  fact  cannot  be  created  by  an  affidavit  that
20
contradicts  prior  deposition  testimony.   Radobenko v. Automated
21
Equipment Corp., 520 F.2d 540, 543-44 (9th Cir. 1975).  The Ninth
22
Circuit has made clear, however, that
23
           The . . . Radobenko rule does not automatically dispose
24         of every case in which a contradictory affidavit is
           introduced  to  explain  portion  of  earlier  deposition
25         testimony.  Rather, the Radobenko court was concerned
           with 'sham' testimony that flatly contradicts earlier
26         testimony in an attempt to 'create' an issue of fact and
           avoid summary judgment.  Therefore, before applying the
27         Radobenko  sanction,  the  district  court  must  make  a
           factual determination that the contradiction was actually
28         a 'sham.'

34 - OPINION & ORDER

1   Kennedy v. Allied Mutual Ins. Co., 952 F.2d 262, 266-67 (9th Cir.

2   1991).  Here, not only is there no basis for finding that the

3   affidavit is a "sham," there is no material inconsistency between

4   plaintiff's affidavit and her deposition testimony.  Defendants'

5   objection is unwarranted.

6       Any other objections by defendants are moot as I have not

7   relied on the evidence in resolving the motion.

8                            CONCLUSION

9       Defendants' motion for partial summary judgment [27] is

10  denied.

11      IT IS SO ORDERED.

12              Dated this  8th   day of November     , 2010.

13

14

15                   /s/ Dennis James Hubel
                     Dennis James Hubel
16                   United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28

35 - OPINION & ORDER